UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

AT LOUISVILLE

ROBERT B. CADY,                                                                    PLAINTIFF


v.                                                        CIVIL ACTION NO. 3:14-CV-00278-CRS


REMINGTON ARMS CO., LLC                                                         DEFENDANT

MEMORANDUM OPINION

I.      Introduction

Robert B. Cady sued Remington Arms Company, LLC ("Remington") for disability

discrimination for failure to accommodate and wrongful discharge, and breach of a severance

agreement.

Remington moves this Court for summary judgment on all claims.  Def.'s Mot. Summ. J.

1, ECF No. 29.  For the reasons below, the Court will grant summary judgment to Remington on

all claims.

II.     Summary Judgment Standard

A party moving for summary judgment must show that "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The Court must determine whether there is a genuine issue for trial. *Anderson v. Liberty

Lobby*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when "there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

The Court must draw all factual inferences in favor of the nonmoving party. *Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Ultimately,

1

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 – 23 (1986).

III.    Undisputed Facts

The Court views the following facts in the light most favorable to Cady, the nonmoving party:

Before starting at Remington, Cady had two back surgeries: one in 2000, and one in 2008.  "An MRI of Robert's lower spine revealed 'multiple abnormalities' including several bulging disks, disk herniation, and 'posterior backing out of cages ... causing 1.5 nerve compression ... with 'moderate to severe' stenosis."[1]  Pl.'s Resp. Opp. Mot. Summ. J. 4, ECF No. 35.  The Court will refer to these diagnoses as Cady's "chronic back issues."  *See* Cady Dep. 259, ECF No. 34-1.

In 2012, he passed his initial physical examination at Remington.  In the year and a half he worked at the Elizabethtown facility, Cady never requested an accommodation for his back.  He also never took off any time for his chronic back issues.

In March 2012, Cady began work at Remington as a Staff Engineer at the Research and Development Technical Center in Elizabethtown, Kentucky (the "Elizabethtown facility").  Remington is a firearms manufacturer and paid Cady a $95,000 salary.

---

[1] Spinal stenosis is "a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine to your arms and legs. Spinal stenosis occurs most often in the lower back and neck."  Mayo Clinic Staff, *Diseases and Conditions: Spinal stenosis*, http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/CON-20036105 (last visited Dec. 23, 2015).

In general, a Staff Engineer "conceives, researches, plans, designs, develops, and implements (into Production) new products and systems..."  Staff Eng'r Position Description, ECF No. 29-3, Page ID# 155.  Under "PHYSICAL DEMANDS" (bold and capitalization in original), the job description says:

> While performing the duties of this job, the employee is regularly required to use hands to finger, handle, or feel objects, tools or controls.  The employee is regularly required to stand; walk; sit; reach with hands and arms; stop, kneel, crouch, or crawl; and talk or hear.  The employee must occasionally lift and/or move up to 25 pounds.

*Id.* at Page ID# 157.  When Remington's counsel asked Cady about whether he could complete the physical demands at the time he was hired, Cady said, "Absolutely."  Cady Dep. 144.

Cady reported to Director of Commercial Firearms Mike Keeney.  Cady did not supervise other individuals, but he did interact with design engineers, suppliers, technicians, and material engineers, among others.  He did not design firearms, but he did manage "project timelines, budgets, and sourcing suppliers."  Peyton Decl. ¶ 4, ECF No. 29-12.

In February 2013, Remington offered Cady a Senior Level Retention and Severance Agreement (the "Severance Agreement"), which he accepted.  The Severance Agreement said: "You have been identified as an employee with skills that are particularly valuable" to Remington.  ECF No. 29-3, Page ID #189.  Remington offered Severance Agreements to many employees at Cady's level because the company was for sale and wanted to provide an incentive to stay.

On April 30, 2013, Cady was in a meeting with Keeney and others to prepare the monthly staff report.  Cady disagreed with how Keeney wanted him to present the safety and functionality of the new handgun Remington was developing.  Cady became "upset" during the meeting.  Cady Dep. 2251.  When the meeting ended, Director of New Process Development Greg Parker

3

and Vice President for Research and Development Engineering Services Scott Franz spoke with Cady.  Cady told them he was going to resign, but Parker and Franz convinced him to stay.

In early May, 2013, Keeney and others sought to "redirect [Cady's] responsibilities into an area that he could potentially maximize his contribution to the organization." Keeney Dep. 72, ECF No. 29-7.  Cady would no longer lead the R51 firearm team, and he would report to Franz, not Keeney.  At this point, Cady had three distinct projects.

One of Cady's remaining three projects included developing a plan and leading DPMS personnel for the assembly of a new AR-15 semi-automatic rifle.  DPMS stands for Defense Procurement Manufacturing Systems and is the name of a plant in St. Cloud, Minnesota (the "St. Cloud facility").

Cady travelled to the St. Cloud facility on multiple occasions to complete this project. He also travelled to a plant in Ilion, New York to see the plant's Creform workbenches[2] and take pictures.  Cady Dep. 257 – 58.

Friday, July 12, 2013, was Cady's last day at the Elizabethtown facility before his scheduled trip to the St. Cloud facility the following week.  That day, Cady told Parker and Laura Norwood, a Human Resources officer, that he was going to the doctor for his back.  Parker testified that Cady told him about his "back concern," and that he had previously had back surgery.  Parker Dep. 16 – 18, ECF No. 30-1.

That day, Cady saw Dr. John Cole, a neurosurgeon.  Dr. Cole prescribed Cady anti-inflammatory medication and told him to follow up in two months.  Dr. Cole did not advise Cady of any needed work restrictions. Cole Dep. 67, ECF No. 29-9.

---

[2] Creform is "an interlocking system of pipes, joints, and wheels of various sizes, which can be customized to fit a particular manufacturing task.  Creform parts are light; no part weighs more than three pounds." Mittelstaedt Decl. ¶ 6, ECF No. 29-16.  The workbenches are designed to increase efficiency within the manufacturing process.

4

Before he left on the trip, Cady did not believe he would be building Creform workbenches "full-time for three solid days," Cady Dep. 131, though he had "some understanding" that he would be asked to do physical work on the trip. *Id.* at 128.

On Tuesday morning, July 16, 2013, Cady arrived at the St. Cloud facility. The plant manager, Todd Mittelstaedt, was unavailable. Lee Vogel, the St. Cloud facility's production manager, told Cady that Mittelstaedt wanted him to build Creform workbenches. When Mittelstaedt became available, he told Cady that building the workbenches was a priority and that he was shorthanded.

Mittelstaedt asked Cady, "I'm going to have you work on Creforms for the next three – three days. Do you have a problem with that?" *Id.* at 268 – 69. Cady responded, "Well, I don't necessarily have a problem with – with working on the Creforms, but I was told that it would be made available to me one person that would be dedicated to the project and that there would be others – that there would be others to help support the activity." *Id.* at 269.

Cady went to the back of the St. Cloud facility with Vogel. Cady did not tell Vogel about his chronic back issues. Vogel and Cady worked together taking materials out of a semi truck and building a workbench for a while.

Eventually, Vogel left Cady. Cady proceeded to build a workbench alone. Cady called Parker who was at the Elizabethtown facility. Cady told Parker he was concerned about his back when he climbed in and out of the truck. Cady also told Parker that he did not want to stand on concrete for long periods of time because "he felt he was hurting his back." Parker Dep. 61.

When Vogel returned to Cady's workstation, Cady was gone. Vogel found Cady in a conference room on his laptop. He was sending emails and reviewing spreadsheets. Vogel asked Cady to return to work on the workbenches.

Cady said that he had been locked out of the building.  By this point, Vogel was "agitated."  Cady Dep. 300.  Vogel brought Cady to Mittelstaedt's office.  For the first time, Cady told Vogel and Mittelstaedt that he was concerned about hurting his back.

Mittelstaedt called Parker.  Mittelstaedt told Parker that he didn't need a "pencil pusher" but that he needed someone to build the benches.  Parker Dep. 64; *see* discussion *infra* Part IV(A).  Parker told Cady to return to his hotel room.  Norwood told Cady to fly home the next day.  When he arrived at the Elizabethtown facility the next morning, Remington fired Cady for "performance issues."  Cady Dep. 302.

Cady sued Remington for failure to accommodate and wrongful discharge under the Americans with Disabilities Act ("ADA") and the Kentucky Civil Rights Act.  Cady also sued Remington for breach of the Severance Agreement.

IV.    Whether Cady can establish prima facie cases for failure to accommodate and wrongful termination

Title I of the ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability" in applications, hiring, advancement, discharge, compensation, training, and "other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The Kentucky Civil Rights Act also prohibits disability discrimination.  *See* Ky. Rev. Stat. § 344.040.   Kentucky courts look to federal case law in interpreting the Kentucky Civil Rights Act.  *See, e.g., Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 705 – 06 (Ky. Ct. App. 2004).

A.  Whether Cady can show direct evidence of discrimination

Direct evidence is evidence that requires the conclusion that the unlawful discrimination was the "but for" cause of the employment decision.  *See Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014).  If the plaintiff does not offer direct evidence of

discrimination, the Court applies the *McDonnell Douglas* burden-shifting framework.  *See id.* at 529.

If the plaintiff relies on direct evidence for failure to accommodate or wrongful termination, the prima facie standard for a disability discrimination claim is

> (1) That he or she is an individual with a disability; (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) that he/she suffered an adverse employment action because of his disability.

*Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) (noting that "his disability was a 'but for' cause of his termination: He would not have been terminated had he not asked about taking leave to treat his medical conditions."); *Ferrari v. Ford Motor Co.*, 96 F.Supp. 3d 668 (E.D. Mich. Mar. 27, 2015) (applying three-element test for direct evidence cases).

Remington argues that Cady must rely on the *McDonnell Douglas* burden-shifting framework because he has no direct evidence of discrimination.  Def.'s Mem. Supp. Mot. Summ. J. 16, ECF No. 29-1.  Cady points to Parker's deposition as direct evidence of discrimination. Pl.'s Resp. 11.

On the morning of July 16, 2013, Cady called Parker from Minnesota about the "conflict with the plant manager [Todd Mittelstaedt] and with Lee Vogel about expectations about what he was supposed to be doing there."  Parker Dep. 60.  Cady told Parker that he "was concerned about his back, doing this up and down" as he climbed in and out of the semi-trailer.  *Id.* at 61. Parker suggested that Cady pull all of the materials to the back of the truck so that Cady could stand on the ground without doing as much climbing.  *Id.*

"Relatively around the same time," Mittelstaedt called Parker and said that "he didn't need Robert there if Robert was going to not be able to perform the physical labor of building the

7

Creform stations and working the process at that point." *Id.* at 65.  Mittelstaedt told Parker that

"he didn't need someone to sit in the conference room and tell him how to do the work.  He

needed someone to help do the work out on the floor and building benches." *Id.* at 63 – 64.

Mittelstaedt did not need a "pencil pusher." *Id.* at 64.

Mittelstaedt followed up with Parker about thirty minutes after the first call.  Parker

testified, "Todd indicated that Robert had met with him and that Robert had explained that he

had a back surgery and a concern of standing on concrete in the area that we were at.  He

indicated that Robert had indicated to him that, you know, this wasn't going to be acceptable,

that he was – you know, he couldn't do this all day long." *Id.* at 65.

Cady also points to Remington's memorandum in support of summary judgment as direct

evidence of discrimination.  Pl.'s Resp. 11.  Remington said it terminated Cady because "he

failed to perform the duties assigned to him," Def.'s Mem. 30, and "because he objected to

performing the essential tasks assigned to him at DPMS." *Id.* at 28.

Viewing this evidence in the light most favorable to Cady, Parker's deposition does not

require the conclusion that disability discrimination was the "but for" cause of Remington's

decision to terminate Cady.  *Cf. Demyanovich*, 747 F.3d at 433.  Parker's deposition also reveals

that he discussed the conflict between Cady and Mittelstaedt with Tony Moore, among others,

that afternoon.  Moore "took over and said, 'Okay.  We can't send him back to the facility if he's

not willing to do the work at that time.'"  Parker Dep. 68.  Parker's full testimony does not

require the conclusion that disability discrimination was the "but for" cause of Cady's firing.  *Cf.*

*Demyanovich*, 747 F.3d at 433.  Instead, the deposition suggests that Cady's perceived

unwillingness to do the work precipitated his firing.

Additionally, the arguments in Remington's memorandum do not require the conclusion that unlawful discrimination was the "but for" cause of Cady's firing. *Cf. Demyanovich*, 747 F.3d at 433. Firing someone for "failing" to perform assigned duties or "objecting" to assigned tasks does not require the conclusion that Remington fired Cady because of his disability.

Absent direct evidence of discrimination, Cady must show indirect evidence of discrimination for failure to accommodate and wrongful termination. *See Scheick*, 766 F.3d at 529.

B. <u>Whether Cady can establish prima facie cases for failure to accommodate and wrongful discharge</u>

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff has the burden of proving a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253.

A prima facie case of disability discrimination for failure to accommodate requires the plaintiff show

> 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) the employer knew or had reason to know of the plaintiff's disability; 4) the plaintiff requested an accommodation; and 5) the employer failed to provide the necessary accommodation.

*Brown v. Humana Ins. Co.*, 942 F.Supp. 2d 723 (W.D. Ky. 2013). A prima facie case of wrongful discharge disability discrimination through indirect evidence requires the plaintiff show:

1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) he or she suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011).[3]

Remington asks this Court for summary judgment on Cady's failure to accommodate and wrongful discrimination claims. At oral argument, Remington conceded that Cady meets the statutory definition of disabled.[4] For purposes of resolving this motion, the Court assumes that Cady meets the statutory definition of disability, and that his chronic back issues substantially limit the major life activity of standing. *See* 42 U.S.C. § 12102(2)(A).

On brief, Remington argued that Cady cannot prove three prima facie elements of a failure to accommodate claim: 1) that Cady was qualified; 2) that Cady requested a reasonable accommodation; and 3) that Remington did not accommodate Cady's disability. Def.'s Mem. 17 – 26. Remington also argued that Cady cannot prove one prima facie element of a wrongful termination claim: that Cady was qualified.

---

[3] Cady argues that a prima facie case for disability discrimination requires the plaintiff show: "that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job in which he suffered an adverse employment action." Pl.'s Resp. 10, ECF No. 35 (citing *Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2002) (citing 42 U.S.C. § 12102(2)(C)). However, the court of appeals has held that the five-element *Monette* test is the "proper test" for indirect evidence and that the three-element *Mahon* test "makes little sense" as a part of the "*McDonnell Douglas* burden shifting-framework." *Whitfield*, 639 F.3d at 259 (discussing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)).

[4] The Court notes that whether Cady's chronic back issues satisfy the statutory definition of disability as "with respect to an individual – a physical or mental impairment that substantially limits one or more major life activities of such individual," 42 U.S.C. § 12102(1)(A), is not clear from the record. Cady testified that he no longer rides horseback, skis, or hunts, Cady Dep. 86 – 87, but sometimes he rides his tractor and pushes a weed whacker with pain. *Id.* at 88 – 89. He also testified that brushing his teeth is painful. *Id.* at 89. As the parties do not dispute this element of the prima facie case, the Court need not address it either.

At oral argument, counsel also argued that Remington did not know or have reason to know of Cady's disability.  The Court will address the notice element first, and whether Cady requested a reasonable accommodation second.

    1.  <u>Whether Remington knew or had reason to know of Cady's disability</u>

        a.  The notice requirement

"At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability.  If it does not know of the disability, the employer is firing the employee 'because of' some other reason." *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995); *see also*, *Yarberry v. Gregg Appliances, Inc.*, 2015 WL 5155553 *1, *8 (6th Cir. Sept. 3, 2015).

As an element of the prima facie case, the plaintiff must establish that the employer "knew or believed that the plaintiff was disabled, or knew of the plaintiff's symptoms that were caused by the disability." *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996). "An employer has notice of an employee's disability when the employee tells the employer that he is disabled." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999).

In *Yarberry*, the court of appeals upheld a district court's grant of summary judgment to the employer. *Yarberry,* 2015 WL 5155553 at *1.   The court found that Hhgregg was on constructive notice of the plaintiff's disability because the human resources officer who fired the plaintiff did so after she knew he had been involuntarily committed to a psychiatric hospital. *Id.* at *9.  The inquiry into whether a defendant knew or believed a plaintiff was disabled is "crucial." *Id.* at *8.   Although the employee was able to establish a prima facie case, the court

upheld summary judgment to Hhgregg because the plaintiff could not establish that the employer's legitimate, nondiscriminatory reason for firing him was pretext for unlawful discrimination. *Id.* at *13.

In *Leeds*, the court of appeals affirmed a district court's grant of summary judgment to the employer. *Leeds v. Potter*, 249 F. App'x 442, 450 (6th Cir. 2007). The plaintiff argued that the employer was on notice of a disability because his direct supervisor saw a disability placard in the plaintiff's car. *Id.* at 450. The court of appeals said the placard "indicates that he knew that Plaintiff had an impairment of some kind. However, proof of [the supervisor's] limited knowledge is not enough to establish Plaintiff's prima facie case. Plaintiff must show that a supervisor knew that he had an 'impairment that substantially limits one or more of the major life activities.'" *Id.* at 450 (citing 42 U.S.C. § 12102(2)).

In *Hammon*, the court of appeals upheld a district court's grant of summary judgment to the employer. *Hammon*, 165 F.3d at 450. The plaintiff had failed to prove that he was "disabled" under the ADA, that the employer was on notice of his disability, that he was qualified for the position, and that he requested an accommodation. *Id.* The plaintiff alleged that his nervous condition arose after a flight instructor screamed at him. *Id.* Although the plaintiff had told colleagues "about his loss of confidence, by his own admission he never suggested that his emotional problems stemmed from a condition of disability." *Id.* He failed to meet his prima facie burden. *Id.*; *see also*, *Burns*, 91 F.3d at 844 ("Burns must show that a genuine issue of material fact exists as to each element of his prima facie case. Burns has failed even this minimal evidentiary hurdle. Specifically, Burns has not established that the City knew or believed that he was [disabled].")

An employer is on notice of an employee's disability when the employer knows of the employee's impairment. *See, e.g.*, *Adams v. Rice*, 531 F.3d 936, 950 (D.C. Cir. 2008) (rejecting government's argument that it could only be liable for disability discrimination if it knew how employee's impairment substantially limited a major life activity); *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 441 (7th Cir. 2008) ("Even if the AIDS claim [was] properly before the court, the judge held, there was no evidence that Log Cabin knew Stewart suffered from AIDS."); *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155 (5th Cir. 1996) ("The evidence does not show that Taylor ever told Matthews that he suffered a limitation as a result of his alleged impairment.") The "bedrock requirement" is "an adequate, prior alert to the defendant of the plaintiff's disabled status." *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 898 (D.C. Cir. 1998).[5]

    b.  Application

Remington argues that it did not know or have reason to know of Cady's disability.  At oral argument, Cady's counsel conceded that Remington could not have known nor had reason to know of Cady's disability until July 16, 2013.

The Court considers the events of July 16 in the light most favorable to Cady.  At most, two moments that day could have provided Remington notice of his chronic back issues.

The first moment is Parker's phone call to Cady the morning of July 16.  Cady arrived at the St. Cloud facility at 7:30 that morning.  Cady Dep. 267.[6]  Cady texted Parker, who was in

---

[5] Although the claims in *Adams* and *Crandall* arose under the Rehabilitation Act, the analysis of disability discrimination claims under the Rehabilitation Act and the ADA are largely the same.  *See Adams*, 531 F.3d at 943.

[6] Vogel and Mittelstaedt's Declarations contradict this.  Vogel and Mittelstaedt both said that Cady arrived at the St. Cloud facility at approximately 9:00.  The Court views this evidence in the light most favorable to Cady and assumes, for purposes of summary judgment, that Cady arrived at 7:30 AM, Central Daylight Time.

Kentucky, saying "I need to talk to you.  Please call me."  Parker Dep. 59.  Parker called Cady

back around 9:00 or 10:00 in the morning.[7]  *Id.*  Parker testified:

> Q: Did [Cady] talk specifically about what the source of the conflict [between
> Cady and Vogel] was?
>
> A: ... Robert indicated that they had him outside, that they had him in the back of
> the facility building these benches, and he indicated that they were not conditions
> that were very good for him at that particular point.
>
> Q: And did he say why the conditions weren't very good for him at that particular
> point?
>
> A: He indicated that there was – all the pieces were at the back of a semitrailer
> that he was having to climb in and then pull out as he needed.  Then he would
> have to get back down on the ground and cut, you know, pieces and parts to
> assemble the racks together at the time.
>
> *He was concerned about his back, doing this up and down*.  You know, I made a
> suggestion, you know – and came through that – to pull all the stuff to the back of
> the truck because it's about that high so he could gather everything and not have
> to get in and out of the truck at the time.
>
> He took that into consideration.  He said he was also – he was working in the sun.
> He was – you know, it was a hot day there.  Those were the main points of his
> contention at the time.
>
> Q: Did he mention that he couldn't stand on concrete, you know, for long periods
> of time?
>
> A: *Yes, he did communicate that he didn't want to stand on concrete for long
> periods of time because, you know, he felt he was hurting his back*.  At the time he
> indicated that – also that it was not conducive for him to be in the sun at that time
> because of his medication.
>
> ...
>
> Q: Okay.  What did you tell him?

---

[7] Parker testified that this call occurred between 10:00 and 11:00 in the morning.  He was
not asked about the time zone to which he was referring, but he was in Elizabethtown, Kentucky
which follows Eastern Daylight Time.  The Court assumes, in the light most favorable to Cady,
that Parker testified that this conversation occurred between 10:00 and 11:00 AM, Eastern
Daylight Time.  Therefore, the call occurred between 9:00 and 10:00 Central Daylight Time
which is the time zone covering where Cady was in St. Cloud.  Cady testified that he talked to
Parker "just before lunch or right around that time frame."  Cady Dep. 288.

> A: I first told Robert that he needed to be safe.  I did not want him to hurt himself
> in any particular way; and if that was the case, that he needed to, you know, cease
> and desist doing at that particular point.  I asked him to contact Lee, who was kind
> of the leader of the project there at the facility that we were trying to work at, and
> to work with Lee to, you know, get better accommodations at the facility.  That he
> could do it from there.

Parker Dep. 61 – 62 (emphasis added).  Cady's testimony regarding this phone call roughly

matches Parker's:

> Q: What did Greg know?
>
> A: Greg knew that I was concerned about my back.  He told – he told me 'not to
> do anything that would hurt your back,' and he told me that I should go talk to
> Lee Vogel, which I did, and make my request.

Cady Dep. 287.

The second moment is Cady's conversation with Mittelstaedt and Vogel in Mittelstaedt's

office later that day.  After finding Cady in the conference room, Vogel had become frustrated

and took him to Mittelstaedt's office.  Cady testified:

> A: We went in Todd's office; that's when disclosed to him, you, concerns the
> back issue.
>
> Q: And was that the first time you had told him that?
>
> A: It was the first time I told Todd; yes.
>
> Q: All right.
>
> A: And in fact it was the first time I had told Lee, but that's still doesn't change
> the fact that I made the request accommodations in making, you know, the
> assembly and all that.

Cady Dep. 296.  Cady's deposition provides no further information as to what he told Vogel and

Mittelstaedt.  Mittelstaedt and Vogel's declarations say that Cady said he "was concerned about

hurting his back."  Mittelstaedt Decl. ¶ 10; Vogel Decl. ¶ 13.  Cady told Mittelstaedt that "he had

a back surgery and a concern of standing on concrete in the area we were at."  Parker Dep. 65.

Viewed in the light most favorable to Cady, the phone call between Cady and Parker did not put Remington on notice of Cady's disability as a matter of law. The conversation between Cady and Parker reveals that Parker knew Cady was "concerned" about his back, that "he felt he was hurting his back, and that he did not want to stand on concrete for long periods of time." *Id.* at 61. At most, all Parker knew was that Cady "felt he was hurting his back," *id.*, but Cady did not provide any details that distinguished this complaint from his other contemporaneous complaints about the location of the workstation and how he did not want to work in the sun.

These vague assertions of Cady's concerns, absent more, cannot constitute notice of an impairment that substantially limits a major life activity. *See* 42 U.S.C. § 12102(1)(A). Cady did not provide Parker any details that would have alerted Parker that Cady needed immediate medical attention, nor did he provide any details that would have alerted Parker that his chronic back issues were more serious that his other complaints.

Additionally, viewed in the light most favorable to Cady, the meeting in Mittelstaedt's office did not put Remington on notice of Cady's disability as a matter of law. At most, Cady disclosed that he had previous back surgeries and was concerned about his back. Although Cady expressed "concerns" about his back and divulged that he had previous back surgeries, he did not disclose that his previous back surgeries stemmed from a disability. *See Hammon*, 165 F.3d at 450.

Cady's vague assertions of a history of back problems cannot constitute notice of an impairment that substantially limits a major life activity. *See* 42 U.S.C. § 12102(1)(A). Knowing that an employee has health problems or symptoms is not the

16

same as knowing that an employee has a disability.  *See Nilles v. Givaudan Flavors Corp.*, 521 F.App'x 364, 369 (6th Cir. 2013); *Childers v. Hardeman Cnty. Bd. of Educ.*, 2015 WL 225058 *1, *7 (W.D. Tenn. Jan. 15, 2015); *E.E.O.C. v. Detroit Cmty. Health Connection*, 2014 WL 6686784 *1, *9 (E.D. Mich. 2014), *appeal docketed*, No. 15-1108 (6th Cir. Feb. 3, 2015); *Johnson v. JPMorgan Chase & Co.*, 922 F.Supp. 2d 658, 667 (S.D. Ohio 2013).  Similarly, an employer cannot be on notice of an employee's disability by virtue of an employee's nonspecific disclosure about a previous surgery, especially if that surgery occurred before the employment relationship began.

Here, Remington could not have been on notice of Cady's chronic back issues by virtue of Cady's nonspecific disclosures about previous back surgeries that occurred before he began work at Remington.  Furthermore, Cady did not provide Parker, Mittelstaedt, or Vogel any details about his chronic back issues that would have distinguished those concerns from his contemporaneous complaints about working in the sun and the location of where he was building the workbenches.

Cady did testify that he feared how the physical activity may affect his back.  *See, e.g.*, Cady Dep. 274 ("I had concerns about where the activity was going to go with my back."); *id.* at 282, ("So in the process of those few times in and out, it became very clear to me that if I had to get up and down inside that semi-trailer, it was not going to turn out well.  At that – at that point there, I – I became really concerned."); *id.* at 274 – 75 ("I realized that I wasn't going to be able to do it safely, or that I was not going to wind up – my fear was I was going to wind up in an emergency room that night.")

Cady's fear that he might end up in the emergency room if he continued to build Creforms has no bearing on whether Remington knew or had reason to know of his chronic back

issues.  There is no testimony that Cady told anyone at Remington that he was afraid of ending up in the emergency room.

The Court is mindful that Cady did not want to disclose his chronic back issues to his colleagues. *See, e.g.*, *id.* at 276 ("I didn't want to disclose that if I didn't have to; right."); *id.* at 299 ("You know, I was trying to find a way to get what I needed to do the job and not have to disclose my personal information like that.")  A stigma can arise when a person expresses a potential weakness like back pain, and admitting one's limitations to colleagues involves a degree of risk.  Still, the law requires that an employee with a disability adequately notify the employer of the disability if the employee wants to invoke laws protecting people with disabilities from discrimination.

Although notice need not be "precise," *Crandall*, 146 F.3d at 898, telling an employer of one's concern about potentially getting hurt or that one has had previous surgeries is not "an adequate, prior alert," *id.*, to Remington of Cady's disabled status.  The phone call with Parker fails to establish that Parker knew or had reason to know Cady was disabled. Cady displayed a fear of hurting his back if he continued building the workbenches all day, but fear of hurting one's back, without documentation from a physician, cannot constitute notice of a person's chronic back issues.  Additionally, the meeting between Vogel, Cady, and Mittelstaedt fails to establish that Vogel or Mittelstaedt knew or had reason to know that Cady was disabled. Cady disclosed that he had previous back surgeries, but previous back surgeries, without documentation from a physician, cannot constitute notice of a person's chronic back issues.

Without sufficient evidence that Remington was on notice of Cady's chronic back issues, Cady has not met his burden of establishing the notice element of his prima facie cases for failure-to-accommodate and wrongful termination.

18

2.  Whether Cady requested a reasonable accommodation

Remington argues that Cady cannot make a prima facie case for failure to accommodate because he did not request a reasonable accommodation.  Def.'s Mem. 22.  Cady argues that he did make a request "to be allowed to mix physically demanding activity with the building."  Pl.'s Resp. 17.

a.  The reasonable request requirement

One definition of "discrimination" under the ADA is "not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(5)(A) (emphasis added).  The court of appeals has said:

> Our case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation. On one hand, we have held that the ADA does not require employees to use the magic words 'accommodation' or even 'disability.' *Leeds v. Potter*, 249 F.App'x 442, 449 (6th Cir. 2007).  On the other hand, 'the employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.' *Gantt v. Wilson Sporting Goods, Co.*, 143 F.3d 1042, 1046 – 47 (6th Cir. 1998).  *The employee also must make clear that the request is being made because of the employee's disability*.  *Leeds*, 249 F.App'x at 449.

*Judge v. Landscape Forms, Inc.*, 592 F.App'x 403, 407 (6th Cir. 2014) (emphasis added).  The proposed accommodation must also be objectively reasonable.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099 (6th Cir. 2008).

b.  Application

Remington argues that Cady never requested an accommodation over the eighteen month period he worked at the Elizabethtown facility.  Def.'s Mem. 22.  Remington points out that Cady arrived in Minnesota and did not request an accommodation when Mittelstaedt "expressly asked Cady if he was prepared to begin the assignment, and Cady did not object or request an accommodation at this time."  *Id.* at 23.  Ultimately, Remington argues that Cady's request was

19

unreasonable because "Cady first mentioned that he was concerned about hurting his back *after* it became clear that Mittelstaedt and Vogel were growing frustrated with excuses." *Id.* at 23 – 24 (emphasis in original).

Cady testified that though "we didn't go into the specifics of it at that time," Cady Dep. 293, he asked to "mix up the work activity," which meant "some standing, some sitting, right, and – and to avoid repetitive-type activities or motions." Cady Dep. 293 – 94.

Viewing the evidence in the light most favorable to Cady, "mixing up the work activity" is not a reasonable request for an accommodation. "Mixing up the work activity" does not make clear from its context that it is being made in order to conform with existing medical restrictions. *See Leeds*, 249 F.App'x at 450.  Remington was not required to speculate as to the extent of his chronic back issues or Cady's need or desire for an accommodation.  *See Gantt*, 143 F.3d at 1046 – 47.  Of course, the ADA "does not require employees to use the magic words 'accommodation' or even 'disability,'" *Leeds*, 249 F.App'x at 449, but Cady failed to make clear that the request to mix up the work activity was made *because of* his chronic back issues.  He offered it at the same time he offered other reasons why the workbench project was not appropriate for him: lack of sunscreen and the location of the workstation.  In this context, "mixing up the work activity" without any specifics, Cady Dep 293, is not an objectively reasonable request for an accommodation.

Cady faults Remington for not engaging in the "interactive process [requiring] communication and good-faith exploration of possible accommodations."  Pl.'s Resp. 16 (citing *Kleiber v. Honda of America Manuf., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)).

The interactive process is an informal dialogue between the employer and employee regarding the employee's limitations and possible accommodations.  *Kleiber v. Honda of*

*America, Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007).  Although the duty to engage in the interactive process is "mandatory," *id.* at 871, "a failure to engage in the interactive process is not an independent violation of the ADA."  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013).  As Cady has failed to offer sufficient evidence that he made a request, Remington had no duty to engage in the interactive process.

Without sufficient evidence that Cady made a reasonable request, Cady has not met his burden of establishing the reasonable request element of his prima facie case for failure to accommodate.

Cady's failure-to-accommodate claim fails as a matter of law because Cady has failed to present sufficient evidence of two prima facie elements: that Remington was on notice of Cady's disability and that Cady made a reasonable request for an accommodation.  Cady's wrongful termination claim fails as a matter of law because Cady has failed to present sufficient evidence of one prima facie element: that Remington was on notice of Cady's disability.

The Court will grant summary judgment to Remington on the failure-to-accommodate and wrongful termination claims.

V.    Cady's Breach of Severance Agreement Claim

Remington asks this Court for summary judgment on Cady's claim for breach of the Severance Agreement because Remington argues that its duty to pay the Severance Benefit did not arise if it terminated Cady for cause.  Def.'s Mem. 29 – 30.

Under the Severance Agreement, an employee received his/her base salary for six months along with other benefits if a "Severance Event" occurred.  Severance Agreement, Page ID# 193.  The Severance Agreement defines "Severance Event" as:

> Termination of the Employee (a) by the Company other than for Cause, death or Total Disability… .  In no event shall any one of the following events be treated as a Severance Event:

21

… (ii) Termination of the Employee by the Company for Cause.

*Id.*  The Severance Agreement defines "Cause" as

> (b) [t]he failure of the Employee substantially to perform the duties of Employee's position or any other duties reasonably assigned to Employee by the Company (other than any such failure due to physical or mental illness) or other material breach by the Employee of any of Employee's obligations owed to the Company …"

*Id.* at Page ID # 192.  The Severance Agreement does not define "physical illness."

Cady argues, "Obviously, there is substantial evidence that Robert was unable to physically build the workstations because of a 'physical illness' thereby preventing summary judgment." Pl.'s Resp. 18.  Cady cites no record facts to support this assertion, nor does he make any argument that his chronic back issues amount to a "physical illness" under the contract.

Viewing the evidence in the light most favorable to Cady, Cady has not shown that his failure to build the workbenches was a failure due to a physical illness.  Although he expressed "concerns" of hurting his back, *see* discussion *supra* Part IV(B)(1)(b), having concerns about potentially hurting oneself is not a physical illness.  Nor does having had previous back surgeries indicate that a person has a physical illness.  Indeed, Cady's testimony revealed that he stopped building the workbenches as a preventative measure, not that he stopped building the benches because he had already hurt himself.  *See, e.g.*, Cady Dep. 282 – 83.

The Court concludes that Remington terminated Cady for cause under the Severance Agreement.  Cady's failure to substantially perform his duties was not due to a physical illness, but rather his fear that if he continued building the workbenches he could end up in the emergency room.  Therefore, under the Severance Agreement, Remington terminated Cady for cause, and Cady is not entitled to the Severance Benefit.

The Court will grant summary judgment to Remington on Cady's claim for breach of the Severance Agreement.

22

VI.     <u>Conclusion</u>

      For the reasons above, the Court will grant summary judgment to Remington on Cady's disability discrimination claims for failure to accommodate and wrongful termination.  The Court will also grant summary judgment to Remington on Cady's claim for breach of the Severance Agreement.  The Court will dismiss Cady's claims without prejudice.

      The Court will enter an order in accordance with this opinion.

January 7, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**